UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LAURETTA PERKINS,<br><br>Plaintiff,<br>v.<br><br>ADESA US AUCTION, LLC et al.,<br><br>Defendants. | CASE NO. 2:24-cv-02097-LK<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

Pro se Plaintiff Lauretta Perkins brings this employment discrimination action against her former employer, ADESA US Auction LLC and Carvana Operations HC LLC. This matter comes before the Court on Defendants ADESA US Auction, LLC and Carvana Operations HC LLC's Motion for Summary Judgment. Dkt. No. 46. Also before the Court are Defendants' motion for a protective order, Dkt. No. 55, and Perkins' motion to amend the scheduling order, Dkt. No. 59. For the reasons set forth below, the Court grants Defendants' motion for summary judgment, denies Defendants' motion for protective order as moot, and denies Perkins' motion to amend the scheduling order as moot.

# I. BACKGROUND

## A. Factual Background

As a subsidiary of Carvana, ADESA facilitates commercial vehicle sales by offering a marketplace where sellers can sell vehicles through in-lane, online, and hybrid auction formats. Dkt. No. 47 at 1. The ADESA Seattle location conducts one "Auction Day" per week, typically on Tuesdays. Dkt. No. 47 at 2. Beginning in January 2022, and continuing throughout her employment, Perkins worked as a part-time "Sale Day Driver" for ADESA. Dkt. No. 46 at 2; Dkt. No. 48 at 6. Perkins was hired to work on Auction Days; her responsibilities included driving vehicles from their staging areas through an auction barn so that the vehicles could be viewed for sale. Dkt. No. 47 at 2. Auction Days typically began at 8:30 a.m. and "last[ed] three to four hours," until all vehicles had been returned. Dkt. No. 48 at 7.

Cary Lee, the Manager of Auction Operations at ADESA, supervised Perkins during her employment. Dkt. No. 47 at 2. Lee managed approximately 30 employees,[1] including Dispatcher Christine Nolan, who assisted with scheduling employee shifts for the Auction Operations department. Dkt. No. 47 at 2. Perkins alleges that on March 8, 2022, she asked Lee if she could "work in consignment" (which apparently includes "delivering or picking up vehicle[s] at other locations"), and he directed her to see Christine Nolan. Dkt. No. 35 at 2. According to Perkins, Nolan told her that "there wasn't enough work" at the time, but she would call Perkins if additional work became available. *Id.* Perkins claims that over the next several months, several workers who did consignment work left, but when she asked to "tak[e] [their] place," Nolan told her that she needed to get Lee's permission "due to a new policy." *Id.* at 2–3. Perkins asserts that this new policy did not apply to others. *Id.* at 3.

[1] In opposition to Defendants' motion, Perkins disputes that Lee managed "more than 30 employees." Dkt. No. 49 at 1. To support her claim, Perkins submitted an ADESA organizational chart, which shows that Lee had 27 employees working under him. Dkt. No. 50-1 at 11–12. This minor discrepancy does not create a material issue of fact.

On February 24, 2023, Perkins sent an email to Lee to inquire about the process for obtaining additional hours. Dkt. No. 47 at 1, 3. Lee responded that drivers seeking additional hours should contact him directly, and informed Perkins that additional hours were dependent on business needs, so they were not assigned according to a set or guaranteed schedule. *Id.* at 3. On April 4, 2023, Perkins followed up with Lee about obtaining additional hours. *Id.* Lee informed Perkins that ADESA did not need additional drivers at the time, but he would keep Perkins in mind if additional work became available. *Id.* A few days later, Lee informed Perkins that additional "lot work" became available, and Perkins accepted the work. *Id.* at 4; Dkt. No. 48 at 17. During some of these shifts, Perkins told Lee that she needed to leave mid-shift and proceeded to clock out, "despite the expectation that she would work the full seven-to-eight-hour shift." Dkt. No. 47 at 4; *see also* Dkt. No. 48 at 18–19. Lee informed Perkins that "in order to work additional shifts consistently, she would need to be able to work the full scheduled hours." Dkt. No. 47 at 4. Perkins worked additional shifts "on several occasions when business needs permitted" throughout 2023 and 2024. *Id.*

On May 25, 2023, Perkins submitted an internal complaint to ADESA Human Resources alleging race- and sex-based discrimination based on her assertion that she did not receive as many additional hours as her male coworkers. Dkt. No. 48 at 52–53 (internal complaint); *id.* at 60–65 (internal complaint report). HR Operations Manager Marria Brydon investigated Perkins' complaint by interviewing Perkins and her supervisor and reviewing time records of other part-time Sale Day Drivers. Dkt. No. 48 at 60–65. During the investigation, Perkins confirmed that she sought to work "11–15 hours per week in half-day schedules," that she was "available to work half days only," and that "full days are too strenuous." *Id.* at 64. Human Resources concluded that Perkins' complaint was unsubstantiated and that, given her limited availability and the operational needs of the business, the hours offered to Perkins were reasonable. *Id.* at 63.

On November 26, 2024, Perkins called Lee to resign from her employment with ADESA. Dkt. No. 48 at 42; Dkt. No. 47 at 4. According to Lee, Perkins informed Lee during the call that she had obtained new employment that offered work hours better suited to her personal and family schedule. Dkt. No. 47 at 4. Perkins claims that she resigned due to "the difference that was being shown between [her] and the other sale day drivers[.]" Dkt. No. 48 at 43.

**B. Procedural Background**

Perkins initiated this action in December 2024. Dkt. No. 1. She filed an amended complaint on September 17, 2025, asserting that ADESA and Carvana engaged in employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq.*, and the Washington Law Against Discrimination ("WLAD") by subjecting her to (1) disparate treatment on the basis of her race, color, and sex; (2) a hostile work environment, and (3) retaliation. Dkt. No. 35. Before the close of discovery, Defendants moved for summary judgment on all of Perkins' claims. Dkt. No. 46.[2]

## II. DISCUSSION

**A. Summary Judgment Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

[2] In her opposition to Defendants' motion for summary judgment, Perkins does not assert that she requires more discovery to oppose their motion, Dkt. No. 49, nor does she do so in her motion to amend the scheduling order, Dkt. No. 59; *see also Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e cannot manufacture arguments for [a litigant.]" (citation modified)).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant has made such a showing, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Nor is it the Court's job to "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B. Discrimination Claims Based on Title VII and WLAD**

A plaintiff can establish a prima facie case of discrimination under Title VII or the WLAD by demonstrating that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for h[er] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside h[er] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (quoting *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 604 (9th Cir. 2004)); *see also Crowe v. Wormuth*, 74 F.4th 1011, 1035–36 (9th Cir. 2023); *Biruk v. Boeing Co.*, No. C25-0779JLR, 2025 WL 1866182, at *4 n.6

(W.D. Wash. July 7, 2025) (noting that "the elements of a prima facie case of disparate treatment under WLAD and Title VII are the same").

Where an employee lacks direct evidence of discrimination, courts follow the three-step evidentiary burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). *See Scrivener v. Clark College*, 334 P.3d 541, 546 (Wash. 2014) (applying the burden-shifting framework to a WLAD claim). Under that framework, the plaintiff first must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Scrivener*, 334 P.3d at 546. If the plaintiff does so, the burden shifts to the employer to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Scrivener*, 334 P.3d at 546. If the employer satisfies this burden, the burden shifts back to the employee to produce evidence that the employer's proffered reason was pretextual. *McDonnell Douglas*, 411 U.S. at 804; *Scrivener*, 334 P.3d at 546.

"Claims arising under the WLAD are typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (citation modified). The Court will, however, grant summary judgment against an employee if she "fails to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 244 P.3d 438, 443 (Wash. Ct. App. 2010); *see also Marquis v. City of Spokane*, 922 P.2d 43, 48 (Wash. 1996) (to survive summary judgment, the employee "must do more than express an opinion or make conclusory statements," and "must establish specific and material facts to support each element of his or her prima facie case").

1. <u>Perkins Has Not Provided Direct Evidence of Discrimination</u>

In her opposition to Defendants' summary judgment motion, Perkins asserts in conclusory fashion that "[b]ecause direct evidence exists, the rigid three-step McDonnell Douglas circumstantial framework is inapplicable or unnecessary[.]" Dkt. No. 49 at 3. But as Defendants point out, Dkt. No. 51 at 2, Perkins does not identify any such evidence. *See generally* Dkt. No. 49. Accordingly, the Court applies the *McDonnell Douglas* burden-shifting framework.

2. <u>Perkins Has Not Established She Suffered an Adverse Employment Action or Disparate Treatment</u>

In her complaint, Perkins alleges that Defendants discriminated against her by "denying [her] more work hours like similarly situated Caucasian male[s] that were drivers" and by applying a different policy to her for obtaining additional work hours. Dkt. No. 35 at 3. Defendants do not dispute that Perkins is a member of a protected class and was qualified for her position, but they assert that summary judgment is warranted because (1) Perkins has "failed to provide any admissible evidence that she suffered an adverse employment action or that she was treated less favorably than similarly situated employees outside of her protected class"; and (2) Perkins admits that "she was offered, and in fact worked, additional hours." Dkt. No. 46 at 9.

Perkins does not substantively respond to Defendants' arguments; instead, she submits a table in which she provides perfunctory and vague "response[s]" to "Moving party's Alleged Uncontroverted Facts." Dkt. No. 49 at 1–2. In response to the "Alleged Uncontroverted Fact" of "Defendants' Operations and Policies," Perkins states, "Undisputed." *Id.* at 1. In response to the "Alleged Uncontroverted Fact" of "Plaintiff Received Additional Work Hours," Perkins states, "Disputed additional hours required approval in advance and expected the employee to work full shift of approximately seven to eight hours, Ex 7 Plaintiff copied date and hours from PYRL [(an unexplained acronym)], Ex. 8, 9, and 10 defendant PYRL Time Card History." Dkt. No. 49 at 2.

Exhibits 7 through 10 span 53 pages and consist of wholly unexplained documents that seem to reflect certain hours worked by various individuals from early 2022 to late 2024. Dkt. No. 50-1 at 22–75.[3] In response to the "Alleged Uncontroverted Fact" of "Plaintiff Continued to Receive Additional Work Hours," Perkins states, "Disputed the three days worked in 2023 were schedule required days due to holiday Ex 5[.]" Dkt. No. 49 at 2. Exhibit 5 appears to consist of amalgamated documents (payroll records and annual calendars) with unexplained highlighting. Dkt. No. 50-1 at 15–20; *See also* Dkt. No. 50 at 2 (Perkins' declaration averring that Exhibit 5 is "true and correct of Plaintiff PYRL CR TT Time Test-Payroll Carvana 000212, 000213, 000214, 000215 produced by Defendant during Discovery").[4]

"[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (citation modified); *see also Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 359 (2024) (a plaintiff "need show only some injury respecting her employment terms or conditions"). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

---

[3] *See also* Dkt. No. 50 at 2 (Perkins' declaration averring that Exhibit 7 is "true and correct of Plaintiff copied Date and Times from Employees PYRL Time Card History produced by Defendant during Discovery," Exhibit 8 is "true and correct of Wayne Munro PYRL Time Card History produced by Defendant during Discovery," Exhibit 9 is "true and correct of Raymond Peters PYRL Time Card History produced by Defendant during Discovery," and Exhibit 10 is "True and Correct of Johnnie Schaeffer PYRL Time Card History produced during Discovery.").

[4] Additionally, in response to the "Alleged Uncontroverted Fact" of "Plaintiff Filed an Internal Complaint and ADESA Promptly Investigated," Perkins states, "Disputed Ex 1 HR Operations Manager didn't interview all parties involved. Making the investigation one sided and unfair. Ex 6, Ex 11 Carvana 000224, 000221, 000222." Dkt. No. 49 at 2. Exhibit 1 is a copy of Carvana's investigation report with unexplained highlighting. Dkt. No. 50-1 at 1–4. The other exhibits are Carvana policies, Dkt. No. 50-1 at 21, 76–78, and as with all her exhibits, Perkins does not explain their import.

Even assuming without deciding that an employer's denial of additional work hours can be an adverse employment action, Perkins has not established that such an action occurred here. Perkins does not contest Defendants' assertion that additional hours were offered on an "as-needed" basis to those who could work the necessary hours. Dkt. No. 49 at 1 (stating that "Defendants' Operations and Policies" are "Undisputed"). And Perkins admits in her deposition that she did indeed receive, and work, additional hours after asking for them. *See* Dkt. No. 48 at 17 ("A few times I was offered additional hours."); *see also id.* at 2, 56–59 (Perkins' undisputed timekeeping records demonstrating that she worked many shifts outside of her normal Auction Day shift on Tuesdays). Notably, when Lee offered Perkins the opportunity to work additional shifts in April 2023, Perkins accepted on the condition that she would only work half days. Dkt. No. 48 at 52 ("I told him yes if I could work half days."). Furthermore, on multiple occasions when Perkins accepted Lee's invitations to work additional full-day shifts, she chose not to work the entire shift and clocked out early. Dkt. No. 48 at 18–19, 55; Dkt. No. 47 at 4 (During additional shifts, Perkins "informed [Lee] that she needed to leave mid-shift and proceeded to clock out, despite the expectation that she would work the full seven-to-eight-hour shift"). Perkins does not dispute Lee's testimony that "[h]er early departures negatively impacted operations." Dkt. No. 47 at 4. Nor does she dispute that Lee explained to her that "in order to work additional shifts consistently, she would need to be able to work the full scheduled hours." *Id.*

In sum, Perkins fails to establish an adverse employment action. To the extent the unexplained exhibits she submitted in connection with her perfunctory response were intended to dispute Defendants' evidence, it is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if she elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan*, 91 F.3d at 1279 (quoting *Richards*, 55 F.3d at 251). Indeed, Local Civil Rule 10(e)(6) requires parties to "cite

the page and line of any part of the . . . record to which their . . . filings refer," and Perkins has failed to do so. "[J]udges are not like pigs, hunting for truffles buried in the record," *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (citation modified), and "cannot manufacture arguments for a [litigant]," *Melnik v. Dzurenda*, 14 F.4th 981, 988 n.2 (9th Cir. 2021) (citation modified).

Perkins likewise fails to establish disparate treatment. Defendants submit evidence that Lee regularly made announcements to all Sale Day Drivers that anyone interested in additional hours should contact him, and he would then reach out if additional work became available. Dkt. No. 47 at 2–3; Dkt. No. 48 at 9, 54. Lee invited Perkins to work additional shifts when additional work became available, Dkt. No. 47 at 4, and Perkins subsequently worked additional shifts on several occasions, *id.*; Dkt. No. 48 at 17. As discussed above, Perkins' perfunctory and vague opposition brief, Dkt. No. 49 at 1–4, does not rebut this evidence that she received additional hours in the same manner and under the same conditions as other Sale Day Drivers. As Defendants contend, Perkins has not "identif[ied] any similarly situated non-Black, male Sale Day Drivers who were treated more favorably . . . by receiving additional hours in circumstances comparable to hers," and "[o]verall, [her] theory rests solely on a conclusory assertion and an imprecise reference to 'timesheets,' without any supporting analysis, comparison, or factual foundation – far short of evidence sufficient to establish discrimination." Dkt. No. 46 at 12.

Accordingly, the Court concludes that Perkins has not raised a genuine issue of material fact regarding her discrimination claims, and Defendants are entitled to summary judgment on these claims.[5]

---

[5] Perkins also alleges that was the only Black and female Sale Day Driver. Dkt. No. 35 at 3. As Defendants point out, this is not an adverse employment action, nor does the law require employers to ensure that there are multiple individuals of any race, color, or sex in the same position. Dkt. No. 48 at 11.

**C. Hostile Work Environment**

Perkins claims she was subjected to a hostile work environment based on her sex and race. Dkt. No. 35 at 3–4. To succeed on her hostile work environment claim, Perkins is required to establish that: (1) she was subjected to a hostile work environment, and (2) Defendants are liable for the harassment that caused the hostile environment to exist. *Fried v. Wynn Las Vegas*, 18 F.4th 643, 647 (9th Cir. 2021). To meet the first element, she must show: (1) she was subjected to verbal or physical conduct because of a protected characteristic; (2) the conduct was unwelcome; and (3) the conduct was so severe or pervasive as to alter the conditions of employment and create an abusive environment. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). "The WLAD requires substantively the same showing." *Brooks-Joseph v. City of Seattle*, 697 F. Supp. 3d 1085, 1102–03 (W.D. Wash. 2023) (citing *Loeffelholz v. Univ. of Wash.*, 285 P.3d 854, 859 (Wash. 2012)). The Ninth Circuit also recognizes a claim for a retaliatory hostile work environment. *See*, *e.g.*, *Ray v. Henderson*, 217 F.3d 1234, 1244–45 (9th Cir. 2000). Under either theory, "[h]arassment is actionable only if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 1245 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

"To determine whether conduct was sufficiently severe or pervasive to violate Title VII," courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (citation modified); *see also Tyner v. State*, 154 P.3d 920, 928 (Wash. Ct. App. 2007) (WLAD). "In addition, the working environment must both subjectively and objectively be perceived as abusive." *Vasquez*, 349 F.3d at 642 (citation modified). "Thus, a plaintiff must show that they perceived the work environment to be hostile

and that a reasonable person in their position would also perceive it as such." *Edgell v. Regan*, No. 2:22-CV-00045-JHC, 2023 WL 8702058, at *16 (W.D. Wash. Dec. 15, 2023).

In her amended complaint, Perkins alleges that "[i]n May 2022, a Caucasian male coworker Jeff (1) became aggressive towards plaintiff, that plaintiff felt threaten[ed], reported it to Cary Lee[.]" Dkt. No. 35 at 3. Perkins further alleges that "[o]n January 24, 2023 [she] asked lane captain Jeff (2) why was the Caucasian male drivers being allowed to pick and choose what vehicles they wanted to drive to the auction block floor. . . . Jeff (2) got angry yelling mind your own business and just do what you're told, make it a hostile work environment." *Id.*; *see also* Dkt. No. 48 at 35 (Perkins' testimony that a coworker told her to mind her own business). Perkins also alleges that "[o]n Juny 6, 2024 supervisor Alan Brown denied plaintiff dinner when they worked in the evening due to a holiday," stating that temporary workers like Perkins "were not allowed to get dinner." Dkt. No. 35 at 3–4. Perkins also contends,

> It had gotten to be so hostile/uncomfortable working there that when other thing[s] would happen like when Wayne on two different occasions back into two objects on the lot, making racial comments or talking about guns that the plaintiff wouldn't report them. It just bec[ame] too stressful for the plaintiff that she decided to quit to protect her physical and mental health.

*Id.* In her deposition, Perkins testified that her coworker Wayne said "Oh, a black live[s] matter sign need[s] to be there" while he and other Sale Day drivers, including Perkins, were in a car together passing by a field of black cows. Dkt. No. 48 at 32, 40. Perkins further testified that another coworker made a racial slur, but she could not remember his name, when it occurred, or what was said. *Id.* at 38–39.

Defendants contend that the actions Perkins complains of do not "reflect conduct tied to a protected characteristic, nor do they approach the level of severity or pervasiveness required to sustain a hostile work environment claim." Dkt. No. 46 at 15. Again, Perkins does not substantively respond to Defendants' arguments. The only reference to Perkins' hostile work

environment claim in her opposition brief is her statement that she "resigned due to hostile work environment Ex. 13." Dkt. No. 49 at 2. However, Perkins makes no other express mention of this claim, and she does not explain her reference to Exhibit 13, which is the portion of her deposition when she testified about the "Black Lives Matter" comment. Dkt. No. 50-1 at 80.

Perkins has not shown that she experienced conduct sufficiently severe or offensive to violate Title VII or the WLAD or that the comments referenced in her complaint were tied to a protected characteristic. Her allegations amount to a handful of isolated comments, by different coworkers, over the course of two years. Dkt. No. 35 at 3–4. But "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citation modified). Only the comment about the absence of a "Black Lives Matter" sign appears to have any connection to race, but this comment was not included in Perkins' amended complaint, and even if she could amend her complaint via deposition testimony (she cannot), she has not alleged sufficient facts to show that Defendants knew or should have known of any of the alleged harassment and failed to correct it.[6] While an employer is liable "only for 'its own' acts," it "can create a hostile work environment by failing to take immediate and corrective action in response to a coworker's . . . racial discrimination *the employer knew or should have known about*." *Fried*, 18 F.4th at 647 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) (emphasis added)).

Perkins also alleges that these comments created an environment that was too stressful for her, and she therefore decided to quit. Dkt. No. 35 at 4. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pennsylvania State Police v. Suders*, 542

[6] Indeed, no management personnel were in the car, Dkt. No. 50-1 at 80, and Perkins testified that she did not tell anyone about the comment, Dkt. No. 48 at 33.

U.S. 129, 141 (2004). Perkins cannot establish that she was constructively discharged, however, because "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Id.* at 149.

Accordingly, Perkins has failed to raise a triable issue regarding her hostile work environment claim, and the Court grants Defendants' motion for summary judgment on this claim.

**D. Retaliation**

To establish a prima facie claim of retaliation under Title VII and the WLAD, a plaintiff must show that "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two." *Lui v. DeJoy*, 129 F.4th 770, 782 (9th Cir. 2025) (quoting *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)); *see also Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018) (WLAD). Once a plaintiff has made this threshold prima facie showing, the *McDonnell Douglas* burden-shifting test applies.

In her amended complaint, Perkins appears to allege that she suffered retaliation, potentially stemming from the internal complaint she filed alleging that she was discriminated against. Dkt. No. 35 at 2–3. In her deposition, Perkins also asserted that after she filed her internal complaint, she suffered an adverse action in the form of Lee looking at her and her computer and creating tension. Dkt. No. 48 at 26, 29 (Perkins' testimony that Lee staring at her created tension and made her uncomfortable).

As discussed above, Perkins has not established that she suffered an adverse action. And she testified in her deposition that even after she filed her internal complaint, ADESA continued to offer her additional hours. *Id.* at 31. Perkins' assertions in her deposition that Lee created tension by looking at her do not suffice to amend her complaint to advance this new theory, nor do they constitute an adverse employment action. Indeed, Perkins testified that she has "no evidence" to prove that Lee's staring and her filing an internal complaint are causally connected. *See id.* at 29.

Thus, Perkins has failed to raise a triable issue regarding her retaliation claim, and the Court grants Defendants' motion for summary judgment on this claim.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment, Dkt. No. 46. The Court DENIES as moot Defendants' motion for protective order, Dkt. No. 55, and Perkins' motion to amend the scheduling order, Dkt. No. 59.

Dated this 5th day of October, 2026.

Lauren King
United States District Judge